1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  IN RE JPMORGAN CHASE                No. 2:13-cv-02414-KJM-EFB
    DERIVATIVE LITIGATION
12

13                                      <u>ORDER</u>

14

15

16

17          This matter is before the court on a motion by certain current and former directors

18  of JPMorgan Chase & Co. (JPMorgan) and nominal defendant JPMorgan to dismiss the

19  plaintiffs' consolidated complaint. Consolidated Shareholder Derivative Compl., ECF No. 29

20  (Compl.).[1] The director defendants are James A. Bell, Crandall C. Bowles, Stephen B. Burke,

21  James S. Crown, Timothy P. Flynn, Ellen V. Futter, Laban P. Jackson, Jr., David C. Novak, Lee

22  R. Raymond, William C. Weldon, and managing directors James Dimon, William B. Harrison,

23  Jr., and Robert I. Lipp. The plaintiffs are Ronald A. Harris, a citizen of California, Jeffrey

24  Shlosberg, a citizen of New Jersey, and Richard Ratcliff, a citizen of California. Compl. ¶¶ 20-22.

25

26

27          [1] Since the court held the hearing in this case, an additional case, originally captioned
    *Horwitz v. Dimon*, No. 2:14-cv-01489-KJM-EFB, was also consolidated with this case.  Order
28  Consolidating Cases, ECF No. 68; Stipulation and Proposed Order, ECF No. 67.

                                      1

1     The defendants move to dismiss for lack of personal jurisdiction, improper venue,

2 and failure to state a claim for which relief can be granted. In the alternative, the defendants move

3 to transfer venue. The court held a hearing on the matter on September 11, 2014, at which

4 Mark C. Molumphy, Joseph W. Cotchett, Frank Bottini, and Kelsey Fisher appeared for the

5 plaintiffs. Stuart Baskin (pro hac vice) and Emily Griffin appeared for defendants Bell, Bowles,

6 Burke, Crown, Flynn, Futter, Jackson, Novak, Raymond, and Weldon; Gary Kubek (pro hac vice)

7 and Ian Long appeared for JPMorgan and defendants Dimon, Harrison, and Lipp. As explained

8 below, the court grants the motion with leave to amend.  Because it grants to leave to amend, the

9 court engages in a thoroughgoing analysis below.

10  I.     BACKGROUND

11        A.     Complaint

12     In mid and late 2013, JPMorgan announced it had agreed to settle claims brought

13 against it by the United States Department of Justice and several State Attorneys General, federal

14 agencies, and institutional investors. Compl. ¶ 4.  The institutional investors included California

15 pension funds CalPERS and CalSTRS.  *Id.*  The settled claims arose from JPMorgan's

16 "packaging, marketing, sale, and issuance of residential mortgage-backed securities (RMBS) . . .

17 prior to Jan. 1, 2009."  *Id.* Ex. A, at 128.  Under these agreements JPMorgan would pay more

18 than $17 billion, including about $300 million of relief to California.  *Id.* ¶ 4.  In its settlement

19 with the Department of Justice, JPMorgan also agreed to a statement of facts, in which it

20 admitted, "in certain instances, loans that did not comply with underwriting guidelines were

21 included in the RMBS sold and marketed to investors; however, JPMorgan, Bear Stearns, and

22 WaMu did not disclose this to securitization investors." *Id.* Ex. A, at 154. The settlements did not

23 resolve a pending criminal investigation against JPMorgan initiated in the Eastern District of

24 California. *Id.* ¶ 190.

25     The plaintiffs allege shareholder derivative claims on behalf of JPMorgan against

26 several current and former JPMorgan directors. They did not make a pre-suit demand on

27 JPMorgan's board, and take the position such a demand would have been futile. *Id.* ¶ 222.

28 According to the Complaint, the directors' actions exposed JPMorgan to harm, "including but not

1   limited to billions of dollars in settlement and potential prosecution," *id.* ¶ 6, and "reputational

2   and other harm that may arise from ongoing civil and criminal investigations," *id.* ¶ 293. They

3   allege the directors "knowingly authorized or recklessly allowed JPMorgan to commit multiple

4   fraudulent and deceptive acts in promoting and selling subprime RMBS that the company created

5   and packaged," *id.* ¶ 8, and that the directors "intentionally or recklessly failed to implement

6   appropriate controls to ensure that this business was done in a legal and appropriate manner,"

7   *id.* ¶ 9.

8         The Complaint makes four claims.  First, the plaintiffs allege the defendants

9   breached their fiduciary duties to JPMorgan. Specifically, the plaintiffs allege the directors

10   breached their duties of candor, loyalty, and good faith because they put their own "pecuniary

11   interests above those of the company." *Id.* ¶ 284. They allege the directors caused JPMorgan to be

12   exposed to risks in the subprime mortgage business; weaken underwriting standards; market

13   RMBS with fraudulent and misleading representations; and conceal material facts from investors.

14   *Id.* They allege the directors failed to implement meaningful internal controls and consciously

15   failed to monitor or oversee JPMorgan's RMBS business, allowing JPMorgan's compliance with

16   underwriting standards to molder. *Id.* They allege the directors failed to prevent JPMorgan's

17   officers and employees from breaking the law and failed to promote a climate within JPMorgan

18   that emphasized compliance with securities laws rather than the pursuit of illegal gains. *Id.* ¶ 286.

19         Second, the plaintiffs allege the defendants committed corporate waste "by paying

20   or approving the payment of executive and/or director compensation based on the illegal conduct

21   described" in the Complaint. *Id.* ¶ 297.

22         Third, the plaintiffs allege the defendants were unjustly enriched because they

23   "derived compensation, fees, and other benefits from JPMorgan" while JPMorgan used "wrongful

24   practices" and because the directors "profited by engaging in" that wrongful conduct. *Id.* ¶ 300.

25         Fourth, the plaintiffs allege that defendants Dimon, Bell, Bowles, Burke, Cote,

26   Crown, Futter, Gray, Jackson, Novak, Raymond, and Weldon violated Section 14(a) of the

27   Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), when they caused JPMorgan to release its

28   2011 and 2012 Proxy Statements. Compl. ¶ 305.  According to the Complaint, these Proxy

1   Statements were "materially false and misleading because they falsely state that the Company's

2   Board of Directors maintained adequate and effective risk oversight over management and failed

3   to disclose to the Company's shareholders material deficiencies in the Board's oversight of

4   management and internal controls." *Id.* ¶¶ 306, 307. These misrepresentations allegedly caused

5   the shareholders to vote down a proposal to divest defendant Dimon of his role as Chairman of

6   the Board and caused the shareholders to re-elect the incumbent directors. *Id.* These votes

7   prevented JPMorgan from "strengthen[ing] Board oversight of management," *id.*, and subjected

8   JPMorgan to "billions of dollars in damages due to the Board's materially deficient oversight of

9   management and the Board's failure to ensure adequate internal controls at JPMorgan," *id.* ¶ 308.

10  Had the proxies been true and complete, these damages "could have been avoided or mitigated."

11  *Id.*

12          B.      Motion to Dismiss

13                  The defendants seek to dismiss the Complaint on several grounds. First, they argue

14  this court lacks personal jurisdiction to hear the plaintiffs' state law claims against them, Defs.'

15  Mot. to Dismiss (Mot.) 4-8, 14-16, ECF No. 48, and that venue is not proper in this district, *id.*

16  16-18. Second, the defendants argue plaintiffs are precluded from litigating demand futility with

17  respect to their § 14(a) claim by the recent decision in *Steinberg v. Dimon*, No. 14 Civ.

18  688(PAC), 2014 WL 3512848 (S.D. N.Y. July 16, 2014). Reply 12-13, ECF No. 58. Even if the

19  plaintiffs are not so precluded, the defendants argue they have nevertheless failed to state a claim

20  under § 14(a). Mot. 8-14. Third, the defendants argue the plaintiffs are precluded from litigating

21  the issue of demand futility with respect to their state law claims, most directly by *Steinberg*.

22  Reply 10-11.  They rely as well on *Siegal v. J.P. Morgan Chase & Co.*, No. 14 Civ. 688(PAC),

23  2012 WL 8161652 (N.Y. Sup. Ct. Aug. 16, 2012), *aff'd*, 960 N.Y.S.2d 104 (App. Div. 2013),

24  *appeal denied*, 990 N.E.2d 135 (N.Y. 2013), and *Asbestos Workers Phila. Pension Fund v. Bell*,

25  No. 652020/2013, 2014 WL 1272280 (N.Y. Sup. Ct. Mar. 28, 2014). Mot. 18-21. Even if the

26  plaintiffs are not precluded from litigating the issue of demand futility, the defendants contend the

27  complaint does not adequately allege the futility of a demand on JPMorgan's board. *Id.* 21-34.

28

1    Finally, the defendants request the court transfer this case to the Southern District of New York

2    based on 28 U.S.C. § 1404(a). *Id.* 34-40.

3          Because the court dismisses the plaintiffs' § 14(a) claim and finds, absent pendent

4    jurisdiction otherwise based on the § 14(a) claim, that the plaintiffs have not made a prima facie

5    showing of personal jurisdiction, it does not reach the issue of demand futility or transfer.

6    II.      DISCUSSION

7          A.      Personal Jurisdiction

8          Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a party may move to

9    dismiss a complaint for lack of personal jurisdiction. Even though the defendant makes a motion

10   under Rule 12(b)(2), it is the plaintiff's burden to establish the court's personal jurisdiction over

11   the defendant. *See Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir.1990). When, as here, the court

12   acts without holding an evidentiary hearing, "the plaintiff need make only a prima facie showing

13   of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498

14   (9th Cir. 1995). In other words, "the plaintiff need only demonstrate facts that if true would

15   support jurisdiction over the defendant." *Id.*

16         When no federal statute governing personal jurisdiction applies, the district court

17   applies the law of the state in which it sits to determine whether it may exercise personal

18   jurisdiction over the defendant. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800

19   (9th Cir. 2004) (citing Fed. R. Civ. P. 4(k)(1)(A)). Here none of the defendants is a resident of

20   California, Compl. ¶¶ 23-37, so the court looks to California's long-arm statute, which is

21   "coextensive with federal due process requirements," *Schwarzenegger*, 374 F.3d at 800-01; *see*

22   Cal. Code. Civ. P. § 410.10. Federal due process requires some "minimum contacts" between the

23   defendant and the relevant forum such that the court's exercise of personal jurisdiction "does not

24   offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*,

25   326 U.S. 310, 316 (1945).

26         The court may exercise either general or specific personal jurisdiction over a

27   non-resident defendant. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414

28   nn.8–9 (1984). "For an individual, the paradigm forum for the exercise of general jurisdiction is

1   the individual's domicile . . . ." *Daimler AG v. Bauman*, 571 U.S. ___, 134 S. Ct. 746, 760 (2014)

2   (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___, 131 S. Ct. 2846, 2853-

3   54 (2011)). Here the plaintiffs do not argue for application of general personal jurisdiction to the

4   defendants, *see* Opp'n 4-6, ECF No. 51, and in any event they do not allege the defendants even

5   entered California, let alone have domicile in the state.

6          The plaintiffs do, however, argue that this court may exercise specific personal

7   jurisdiction over the defendants. *Id.* The test for specific personal jurisdiction, referred to here as

8   the "*Schwarzenegger* test," has three parts: first, the plaintiffs must show that each defendant

9   purposefully directed its activities to the forum or purposefully availed itself of that forum;

10  second, the plaintiff must show that its claim arises out of or is related to those activities; and

11  third, if the plaintiff makes this showing, the burden shifts to the defendant to show that exercise

12  of personal jurisdiction would be unreasonable or unfair. *Schwarzenegger*, 374 F.3d at 802.

13                      1.      Purposeful Availment

14         The first prong of the *Schwarzenegger* test requires the defendants' "purposeful

15  availment" of the forum. *Id.* The plaintiff must show the defendant "(1) committed an intentional

16  act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to

17  be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co., Inc. v.

18  Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). An "act" is "an external manifestation of the actor's

19  will and does not include any of its results, even the most direct, immediate, and intended."

20  *Schwarzenegger*, 374 F.3d at 806 (quoting Restatement (Second) of Torts § 2 (1964)).

21  "Intentional" in this context refers to "an intent to perform an actual, physical act in the real

22  world, rather than an intent to accomplish a result or consequence of that act." *Id.* The defendant

23  need not have any physical contact or presence within the forum state. *Burger King Corp. v.

24  Rudzewicz*, 471 U.S. 462, 476 (1985). But a plaintiff does not adequately allege purposeful

25  availment by the mere fact the defendant could foresee its intentional acts would have an effect in

26  the forum state. *Schwarzenegger*, 674 F.3 at 804-05 (citing *Calder v. Jones*, 465 U.S. 783, 789

27  (1984)). "Something more" than foreseeability is required. *Id.* Due process requires "the

28  defendant's conduct and connection with the forum state are such that he should reasonably

6

1  anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.

2  286, 297 (1980).

3         As the word "reasonably" may suggest, whether the defendant "expressly aimed"

4  activities at the forum state is a contextual inquiry and depends on the wrongs alleged. *See*

5  *Schwarzenegger*, 674 F.3 at 807. Here the plaintiffs bring a derivative suit on behalf of

6  JPMorgan. They allege the director defendants "knowingly authorized or recklessly allowed

7  JPMorgan to commit multiple fraudulent and deceptive acts in promoting and selling subprime

8  RMBS that the company created and packaged." Compl. ¶ 8. This allegation raises two questions.

9  First, considering the plaintiffs bring claims on behalf of JPMorgan, a Delaware corporation with

10  its principal place of business in New York, *id.* ¶ 23, were the defendants' actions expressly

11  directed at California and not Delaware or New York? And second, do the plaintiffs' allegations

12  support something more than the foreseeability of harm in California?

13                  a.     Derivative Suits

14         A shareholder derivative suit allows the shareholder to bring a complaint against

15  the corporation's officers and directors on the corporation's behalf. *Rosenbloom v. Pyott*, 765

16  F.3d 1137, 1147 (9th Cir. 2014). It is meant as a tool for shareholders to protect the corporation

17  from its directors and managers. *See id. at* 1147-48.  The claim belongs to the corporation, and

18  not to the shareholders. *See id.; Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991).

19         To survive the instant motion to dismiss under Rule 12(b)(2), the plaintiffs must

20  adequately allege that JPMorgan's directors purposefully directed activities at California, and that

21  their claims arise from those purposefully directed activities. But because they bring a

22  shareholder derivative suit, the claims they bring belong to the corporation. And because

23  JPMorgan is a Delaware corporation with its principal place of business in New York, the

24  question arises whether the plaintiffs can both adequately allege the defendants purposefully

25  directed harm at the corporation, and also that the defendants directed harm anywhere other than

26  Delaware or New York, and in particular toward California.

27         Although there is no Ninth Circuit authority squarely on point, other courts'

28  handling of this question is instructive.  In *Beene v. Beene*, No. C 11–6717 JSW, 2012 WL

1    3583021 (N.D. Cal. Aug. 20, 2012), the plaintiff brought both a derivative claim and a direct

2    claim against the officers and directors of a closely-held Tennessee corporation. *Id.* at *1.  All of

3    the defendants' relevant actions occurred in Tennessee. *Id.* at *5. Nevertheless, the plaintiff

4    alleged that the defendants "intentionally targeted these actions at him and at the other California

5    Shareholders, because they intended to reduce the value of Plaintiff's stake in [the corporation]."

6    *Id.* To support this claim, the plaintiff alleged the corporation had sales agents and distributors in

7    California and California was a "substantial market" for its subsidiaries' products. *Id.* at *1.  The

8    court concluded that "[t]o the extent Plaintiff asserts derivative claims against the Individual

9    Defendants and on behalf of [the corporation], the Individual Defendants' conduct would have

10   been targeted at [the corporation] and the harm would have been felt by [the corporation],

11   notwithstanding the incidental impact on Plaintiff."  *Id.* at *6.  Therefore, the plaintiff did not

12   meet his burden to allege the defendants purposefully directed their activities at the plaintiff in

13   California. *Id.*

14           In *Young v. Colgate-Palmolive Co.*, 790 F.2d 567 (7th Cir. 1986), the plaintiff

15   shareholder filed a derivative complaint against the Colgate board alleging breaches of fiduciary

16   duty in its adoption of an anti-takeover device. *Id.* at 568. The court's decision does not describe

17   in any more detail the harm the plaintiff or the corporation allegedly suffered. The plaintiff was

18   an Illinois resident and the company a Delaware corporation with its principal place of business in

19   New York, but "qualified to do business in Illinois." *Id.* The defendants contested the district

20   court's personal jurisdiction over them. *Id.* at 569. The Seventh Circuit agreed with the district

21   court that personal jurisdiction was lacking under Illinois law. *Id.* at 570-71.  The Circuit did not

22   base its decision on the character of the suit as derivative, and it also rejected the plaintiff's

23   "impact theory" of personal jurisdiction, both under Illinois and federal constitutional law. *Id.* at

24   571-72. Rather, the court focused on the directors' contacts with the plaintiff and Illinois. *Id.* It

25   held that "mere adverse effects on a corporation which is present within a state" were insufficient

26   to confer personal jurisdiction. *Id.* at 572. Considering only the impacts of the defendants' actions

27   "would impermissibly shift the focus of the jurisdictional inquiry" from the defendants'

28

1  purposeful activities to "the random or fortuitous presence or residence of the plaintiff." *Id.* Such

2  a standard would fail to provide the constitutionally required fair warning. *Id.*

3  The director defendants here point to *Beene* and *Young* to illustrate their argument

4  that "derivative suits almost always are heard in the state where a corporation has its principal

5  place of business or is incorporated." Mot. 6-7; *see also* Reply 3-4, ECF No. 58 (also citing

6  *Wixon v. Wyndham Resort Dev. Co.*, No. C 07-02361 JSW, 2008 WL 1777494, at *6 (N.D. Cal.

7  Apr. 18, 2008) (alleged violations of fiduciary duties in derivative claim "expressly aimed" at

8  state of incorporation); *In re Infosonics Corp. Deriv. Litig.*, No. 06cv1336 BTM(WMc), 2007 WL

9  2572276, at *4 (S.D. Cal. Sept. 4, 2007) (in derivative suit, defendant directors' acts alleged to

10  have harmed corporation "expressly aimed" at the corporation's principal place of business);

11  *Mehlenbacher v. Jitaru*, No. 6:04 CV 1118 ORL-22KRS, 2005 WL 4585859, at *12-14 (M.D.

12  Fla. June 6, 2005) (in derivative suit, director's alleged wrongdoing was directed at state in which

13  corporation had its headquarters)).[2] *See also Bartkowski v. Foni*, No. Civ. A. 07-1018, 2007 WL

14  2728844, at *3 (E.D. Pa. Sept. 17, 2007) (under Pennsylvania law, plaintiff did not suffer injury

15  in Pennsylvania because action was derivative, brought on behalf of Nevada corporation with its

16  principal place of business in Colorado, and "real party in interest" was corporation, "not the

17  individual shareholder"; the corporation "would have 'felt' the harm in Nevada or Colorado, but

18  not in Pennsylvania").  At the hearing on this motion, counsel for the independent directors

19  confirmed their position that derivative cases are always brought either in the state of

20  incorporation or principal place of business, or they are dismissed.

21  The court, however, has found no controlling authority to compel the result the

22  defendants seek.  And not every shareholder derivative suit must be brought in the defendant

23  corporation's state of incorporation or principal place of business. In *Greenspun v. Del E. Webb

24  Corp.*, the plaintiff shareholder brought a derivative suit in Nevada against the defendants –

25  corporate directors, all apparently citizens of other states, and its auditor, a New York partnership

26  _____

27  [2] Defendants also note a similar result in *In re Countrywide Financial Corporation
Mortgage Backed Securities Litigation*, No. 2:11–ML–02265–MRP (MANx), 2012 WL 1322884,
at *7 (C.D. Cal. Apr. 26, 2012), *see* Mot. 7, although that case was not a derivative suit.

28

1   – on behalf of an Arizona corporation. 634 F.2d 1204, 1206-08 (9th Cir. 1980).[3] The Ninth

2   Circuit did not note the corporation's principal place of business, although the company's board

3   held meetings in Nevada and developed property in that state. *Id.* at 1206.

4   　　　In *Greenspun*, the plaintiff alleged the defendants had conspired to preserve one of

5   the director defendants' control over the corporation and wrongly divert its assets. *Id.* He alleged

6   causes of action for corporate waste and mismanagement. *Id.* The defendants allegedly delayed

7   disposal of an estate to preserve a controlling vote; amended the corporation's articles to increase

8   the number of directors; diluted the shareholders' equity by extending option warrants; were

9   subject to conflicts of interest as both members of the board and the law firm representing the

10   company; extended the terms of loans made to the defendants; caused the company to

11   inadequately disclose losses, incur excessive loans, and fail to develop Nevada real property; and

12   diverted corporate assets to purchase California real estate. *Id.* The district court had granted the

13   defendants' motion to dismiss in part because the Nevada long-arm statute did not reach the

14   defendants. *Id.* at 1205-06. Considering both the Nevada long-arm statute[4] and federal due

15   process, the Ninth Circuit disagreed as to the New York partnership and one of the directors and

16   found the district court had personal jurisdiction over those two defendants based on their

17   physical contacts with Nevada and business in the state. *Id.* at 1207-08.

18   　　　In *D'Addario v. Geller*, the plaintiff shareholders brought a derivative action on

19   behalf of RMST, a Florida corporation with its principal place of business in Georgia; they filed

20   in federal district court in Virginia. 264 F. Supp. 2d 367, 375 (E.D. Va. 2003). None of the

21   individual defendants was a citizen of Virginia. *Id.* at 376. The plaintiff alleged the defendants

22   had participated in a scheme to loot RMST and had engaged in fraud, self-dealing,

---

23   　　　[3] Even if *Greenspun* was wrongly decided, any error does not impede the analogy here.

24   *See Country Nat. Bank v. Mayer*, 788 F. Supp. 1136, 1140 n.4 (E.D. Cal. 1992) (Circuit applied
federal law to the issue of demand futility rather than Arizona law).

25

26   　　　[4] Unlike the California statute relevant in this case, the Nevada statute was not coextensive
with the requirements of federal due process. *See Greenspun*, 634 F.2d at 1207 n.3 (reproducing

27   the Nevada statute). Because the Ninth Circuit upheld personal jurisdiction, however, this
discrepancy is unimportant: the court expressly held the requirements of due process did not bar

28   exercise of personal jurisdiction. *Id.* at 1207-08.

1   mismanagement, insider trading, diversion of corporate assets, and waste, and were liable under

2   the Racketeer Influenced and Corrupt Organizations Act (RICO) and Florida corporation law. *Id.*

3   Because the defendants all contested the court's personal jurisdiction over them, the district court

4   allowed the plaintiff to conduct limited discovery on this issue. *Id.* at 376-77. Discovery appears

5   to have focused on the number and nature of the defendant's contacts with Virginia and whether

6   these were made in a personal or professional capacity, *id.* at 382-86, especially considering the

7   defendants' reliance on the "fiduciary shield doctrine," *id.* at 380-82.

8           The court appears not to have considered the effect of the fact the corporation was

9   neither a Virginia corporation nor had Virginia as its principal place of business. None of the

10  parties disputed the district court's personal jurisdiction over RMST. *Id.* at 376. Rather, in

11  satisfying itself it had jurisdiction, the court emphasized the directness of the defendant's contacts

12  with Virginia and gave weight to the fact the corporation had previously commenced an *in rem*

13  action in the same court to become salvor-in-possession of the wreckage of the doomed Titanic:

14          In this case, plaintiff has alleged direct, personal involvement by
            the corporation's directors in decisions and acts that are causally
15          related to the alleged injury. Thus, the claim rests on much more
            than current and former management's position as officers or
16          employees of RMST.

17          . . .

18          . . . [I]n this case, defendants cannot reasonably assert unfair
            surprise at being sued in Virginia, particularly when they have
19          voluntarily presented RMST's financial condition before this court
            in the salvage action. Defendants should not be able to establish
20          immunity from jurisdiction by blinding themselves to a
            relationship they have created and sustained with this forum.
21          RMST's management should have reasonably anticipated that their
            individual actions in the discharge of their fiduciary duties would
22          be subject to this court's scrutiny.

23  *Id.* at 381-82 (citations, footnotes, internal quotation marks, and alterations omitted). The court

24  went on to describe each defendant's contacts with the forum. *Id.* at 382-86. It noted "this case is

25  not the typical case, as RMST is not merely a party in a normal case. This court oversees the very

26  reason for this corporation's existence." *See id.* at 381 n.10.

27          In *Doltz v. Harris & Assocs. Grooving, Inc.*, the plaintiff filed both direct and

28  shareholder derivative claims on behalf of a Florida corporation with an alleged principal place of

business in Florida.  No. CIV.A.01-5458, 2002 WL 524185, at *1-2 (E.D. Pa. Apr. 5, 2002).  The

plaintiff was a former director, vice president, and general manager of the corporation in question.

*Id.* at *1.  He lived and worked from his home in Pennsylvania and filed the case in Pennsylvania.

*Id.*  The court denied the defendant directors' motion to dismiss for lack of personal jurisdiction.

*Id.* at *3.  It based its decision on allegations that the corporation and defendants maintained a

place of business in Pennsylvania, purchased Pennsylvania real property, employed Pennsylvania

residents, and the corporation was prequalified for bidding on contracts in Pennsylvania.  *Id.* at

*1.  It also noted the defendants maintained daily verbal contact with the plaintiff while he lived

in Pennsylvania and visited Pennsylvania for business.  *Id.*  The court did not address the

significance of the suit's derivative nature, and evaluated jurisdiction simultaneously for the

derivative and direct suits.  *Id.* at *1-2.

        Although not a derivative case, *Openwave Systems Inc. v. Fuld*, 2009 WL 1622164

(N.D. Cal. Jun. 6, 2009), is also instructive.  In *Openwave*, the defendants were directors and

employees of Lehman Brothers Holdings, Inc. *Id.* at *1. The plaintiffs claimed that Lehman —but

not the defendants personally — had acted fraudulently when it sold them auction rate securities.

*Id*. at *1-2. The complaint alleged Lehman had implemented a plan to solicit California residents

to purchase securities at the defendants' direction and according to their plan. *Id.* at *11. It alleged

that a "substantial portion" of Lehman's business was with California investors. *Id. See also In re

Countrywide Fin. Corp. Mortg. Backed Sec. Litig.*, No. 2:11-ML-02265-MRP (MANx), 2012 WL

1097244, at *13 (C.D. Cal. Mar. 9, 2012) (citing *Openwave* and emphasizing the importance to

purposeful direction that Lehman conducted a "substantial portion of its [auction rate securities]

business" in the forum).  The complaint also alleged the defendants acted knowingly to conceal

specific information from investors and that the misrepresentations and omissions took place in

California. *Id.* The Northern District court looked to Ninth Circuit law on director and officer

liability to conclude it was sufficient for the plaintiffs to allege the defendants participated in the

harmful plan and that each obtained financial benefits for that participation. *Id.* at *11-12 (quoting

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) ("A

corporate officer or director is, in general, personally liable for all torts which he authorizes or

1   directs or in which he participates, notwithstanding that he acted as an agent of the corporation

2   and not on his own behalf".)).  The court in *Openwave* held these allegations were sufficient to

3   draw the defendants within its personal jurisdiction based on the effects test of *Calder v. Jones*,

4   465 U.S. 783 (1984).  In a later case, the Central District suggested the logic in *Openwave*

5   "pushes the boundaries of personal jurisdiction," but endorsed *Openwave's* holding that plaintiffs

6   must allege activity was specifically directed at the forum state. *In re Countrywide Fin. Corp.*

7   *Mortg. Backed Sec. Litig.*, No. 2:11–ML–02265–MRP (MANx), 2012 WL 1322884, at *9 (C.D.

8   Cal. Apr. 15, 2012).

9          The plaintiffs here argue *Openwave* is analogous to this case.  Opp'n 5. They say

10  the directors failed to prevent JPMorgan from incurring liability under the settlement agreements

11  announced in 2013, including a settlement with the California Attorney General, CalPERS, and

12  CalSTRS. *Id.* They have alleged "JPMorgan has substantial business operations in California, and

13  a substantial portion of JP Morgan's mortgage lending operations is based out of and is conducted

14  in California." Compl. ¶ 16. They also allege "[a]ll of the Defendants were involved with or

15  responsible for JPMorgan's policies and procedures in regards to the origination and

16  securitization of subprime mortgage loans, and the marketing and sale of subprime RMBS in

17  California." *Id.*  "The Defendants either knowingly or with reckless disregard of the truth

18  concealed information from persons in California regarding JPMorgan's own misconduct in the

19  subprime RMBS market." *Id.* Because a "substantial portion" of JPMorgan's RMBS business was

20  conducted in California, plaintiffs contend JPMorgan was logically harmed in California, and the

21  defendants purposefully directed their actions to California. Compl. ¶ 16; Opp'n 5 (quoting

22  *Openwave,* 2009 WL 1622164 at *12).

23          This court concludes it is not strictly necessary that a shareholder derivative suit is

24  brought in the state of the corporation's incorporation or principal place of business.  But without

25  these foundational facts, other facts are needed to particularly tie the corporation to the forum.  In

26  *Greenspun*, the corporation held board meetings and developed real property in the forum state.

27  634 F.2d at 1208.  In *D'Addario*, the Virginia district court described the individual defendants'

28  extensive contacts with the forum and the court itself, which was the cause of the corporation's

13

1    existence. 264 F. Supp. 2d at 381-86.  And in *Doltz*, the court did not distinguish between the

2    corporation's contacts and those of the individual defendants, but described several specific

3    contacts with the forum.  2002 WL 524185, at *1-2.  *Openwave*, although not a derivative suit,

4    appears to set an outer limit on the jurisdictional analysis, requiring that directors conceive of and

5    participate in a plan or scheme that targets the forum if they do not have personal contact with

6    that forum.  2009 WL 1622164 at *11-12.  When a suit is brought outside such a state, due

7    process requires the corporation's and individual defendant's contacts with the state must be

8    substantial and clearly alleged.

9                      b.       Activity Expressly Directed at California

10          So do the plaintiffs adequately allege the defendants expressly directed activity at

11   California?  In answering this question, the court focuses on each defendant's actions and not

12   those of the corporation or its employees collectively. *Cf. Keeton v. Hustler Magazine, Inc.*,

13   465 U.S. 770, 781 n.13 (1984) ("[J]urisdiction over an employee does not automatically follow

14   from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent

15   corporation automatically establish jurisdiction over a wholly owned subsidiary."); *Countrywide*,

16   2012 WL 1322884 at *7 ("[The plaintiff] may not bootstrap jurisdiction over any individual from

17   jurisdiction over either their company or any other individual.") (citing *Keeton*, 465 U.S. at 781

18   n.13).

19          At the same time, a defendant need not personally undertake the actions on which

20   a plaintiff stakes personal jurisdiction.  As in *Openwave*, if the individual defendants have not

21   personally made the allegedly fraudulent sales, it is sufficient for plaintiffs to allege each

22   defendant "conceived of and chose to participate in and implement the plan that cause[d] the

23   specified misrepresentations and omissions to [the plaintiff], and . . . each defendant obtained

24   substantial financial benefits from the activities conducted in California." *Id.* at *11-12.

25          This court must test whether plaintiffs' allegations here support the conclusion that

26   each defendant participated in actions expressly directed at California, whether individually or as

27   part of a larger plan or strategy.

28

Plaintiffs make the following allegations specific to California and related to the claims in the complaint:[5]

- On August 7, 2013, JPMorgan announced . . . that it was under criminal investigation in the Eastern District of California for its involvement in the subprime mortgage crisis. ¶ 2; *see also* ¶¶ 4, 7, 18, 46, 186, 190, 293.[6]

- November 19, 2013, JPMorgan and the U.S. Department of Justice separately announced a $13 billion settlement resolving claims against JPMorgan by the Justice Department, several State Attorneys General, the Federal Deposit Insurance Corporation, the National Credit Union Administration and the Federal Housing Finance Agency relating to RMBS activities by JPMorgan. That same day, the California Attorney General, Kamala Harris, announced that JPMorgan will pay $298,973,000 of that total to California, based on JPMorgan's misrepresentations in RMBS sold to California's public employee and teacher pension funds, CalPERS and CalSTRS, between 2004 and 2008. ¶ 4; *see also* ¶¶ 188, 190.

- JPMorgan has substantial business operations in California, and a substantial portion of JP Morgan's mortgage lending operations is based out of and is conducted in California. California, as one of the largest and fastest growing states in the United States is, and at all relevant times was, one of the states with the largest number of subprime loan originations. All of the Defendants were involved with or responsible for JPMorgan's policies and procedures in regards to the origination and securitization of subprime mortgage loans, and the marketing and sale of subprime RMBS in California. The Defendants either knowingly or with reckless disregard of the truth concealed information from persons in California regarding JPMorgan's own misconduct in the subprime RMBS market. ¶ 16.

- [T]hrough their misconduct, the Defendants caused substantial harm and injury in California. A substantial portion of JPMorgan's shareholders, including certain of the Plaintiffs, are citizens of California. ¶ 17.

- [A] substantial part of the events or omissions giving rise to the claims alleged occurred in California. ¶ 18.

- Plaintiff RONALD A. HARRIS ("Harris") is a California citizen . . . . Plaintiff RICHARD RATCLIFF ("Ratcliff") is a California citizen . . . . ¶¶ 20, 22.

- JPMorgan conducts a majority of its business in the United States and substantial business in the State of California. ¶ 23.

- JPMorgan transformed its massive exposure to high risk subprime lenders into RMBS, which it then turned around and marketed and sold to investors, many of whom are residents of California. ¶ 42.

---

[5] Additional references to California are not related to the plaintiffs' claims and so are not relevant to evaluating specific personal jurisdiction. *See* ¶¶ 55-56, 62-63.

[6] All paragraph citations are to the Complaint.

- In addition to approving loans based upon inflated incomes, [Chase Home Finance (CHF), a JPMorgan subsidiary] employees have admitted approving loans based upon inflated appraisal values. In fact, CHF employees were reportedly "not allowed to contest appraisals that appeared to be inflated." As a result of the housing bubble, appraisers over-adjusted and ensured that the appraisals came in at or above the sales price. For example, there are reports of one subdivision in California in which homes sold in the second phase of the subdivision build-out doubled the value of those sold in the first phase, which had occurred just a few months earlier. ¶ 152.

- [O]n November 15, 2013, JPMorgan announced a $4.5 billion settlement with 21 major institutional investors relating to RMBS trusts issued by JPMorgan. ¶ 187. At argument, counsel for the plaintiffs represented that these investors included PIMCo, based in California.

The plaintiffs also make several more general allegations tied to their claims. For example, they allege JPMorgan was "one of the principal actors in the subprime RMBS crisis." Compl. ¶ 41; *see also id.* ¶¶ 42, 95, 133. They claim JPMorgan's board made an affirmative decision to push into the RMBS market nationwide to increase its profitability and relied on the profitability of the RMBS business. Compl. ¶¶ 42, 44, 66, 116, 120, 214. They allege JPMorgan's employees faced perverse incentives to emphasize profits at the expense of sound lending practices. Compl. ¶¶ 119, 146, 147.

On the basis of these allegations, this court's personal jurisdiction over the defendants is in doubt. The complaint does not include allegations that the directors knew a "substantial portion" of JPMorgan's RMBS business was conducted in California. It does not allege the directors affirmatively resolved to pursue more packaging of mortgage loans in California any more than those in other states. It does not allege they pursued a strategy to sell RMBS to California investors, or held any meeting or had other physical contacts with California.

Rather, the plaintiffs rely on the reader to supply necessary details of the directors' knowledge and purpose, by inference from very broad allegations: JPMorgan planned to grow a national RMBS business. A substantial portion of the RMBS business was conducted in California. Many of JPMorgan's investors were in California. Some questionable lending occurred in California. The Department of Justice conducted an investigation of JPMorgan's RMBS business in this district. A portion of the November 2013 settlement was paid to California. JPMorgan's problems were national. JPMorgan's national RMBS business was built

16

1    on compensation structures that in retrospect were unwise. And JPMorgan's management pursued

2    aggressive practices in its national business for which JPMorgan later became liable under the

3    2013 settlement agreements.  These jurisdictional allegations do not provide the clarity of those in

4    *Greenspun*, *D'Addario*, *Doltz*, or even *Openwave*, and are not sufficient to show or allow a

5    reasonable inference of purposeful availment.

6                          2.    The "But-For" Test

7                The second prong of the *Schwarzenegger* text focuses on the connection between

8    the defendant's acts and the harm those acts caused. It requires the plaintiff show the claim would

9    not have arisen but for the defendant's contacts with California. *Ballard*, 65 F.3d at 1500 ("The

10   question . . . is this: but for [the defendant's] contacts with [the forum], would [the plaintiff's]

11   claims against the [defendant] have arisen?").  Other decisions have articulated the test as

12   requiring a "direct nexus" between the defendant's contacts with the forum and the cause of

13   action.  *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013)

14   (quoting *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1996)),

15   *cert. granted*, ___ U.S. ___, 134 S. Ct. 2899 (U.S. 2014).[7]

16               Despite its apparently strict language, many district courts in the Ninth Circuit

17   have not applied the but-for test stringently.  In *Ballard* itself, the Ninth Circuit's application of

18   this test to the facts was brief: "[The plaintiff] . . . argues that if [the defendant] had not done

19   business in the United States, she would have no claim against it, because in the absence of [the

20   U.S.] banking network, [a Ponzi schemer] would not have opened an account at the [defendant]

21   Bank and filled it with ill-gotten funds. This logic seems sound."  65 F.3d at 1500.  The Northern

22   District's discussion in *Openwave* was similarly sparse: "This [but-for test] is satisfied here.

23   Openwave's claims arise out of the defendants' alleged conception of, participation in, and

24   authorization of Lehman's plan to market ARS as a safe, liquid investment when in fact it was not

25   _____

26           [7] The Supreme Court granted certiorari on the question whether "the Natural Gas Act
     preempt[s] state-law claims challenging industry practices that directly affect the wholesale

27   natural gas market when those claims are asserted by litigants who purchased gas in retail
     transactions?" Petition for Writ of Certiorari, *In re W. States Wholesale Natural Gas Antitrust*

28   *Litig.*, No. 13-271 (Aug. 26, 2013).

1   and was being artificially supported by Lehman."  2009 WL 1622164, at *13.  *See also, e.g.,*

2   *MCA Records, Inc. v. Charly Records, Ltd*, 108 F.3d 338, 1997 WL 76173, at *5 (9th Cir. Feb.

3   21, 1997) (unpublished memorandum) ("Because some of the advertisement and sales activity

4   was directed to California, [the plaintiff's] claims arise out of this forum-related activity.");

5   *Wixon*, 2008 WL 1777494, at *6 (plaintiffs met their burden under this test for no other reason

6   than their "claim for breach of fiduciary duty arises out of the actions the Director Defendants are

7   alleged to have taken."); *Infosonics*, 2007 WL 2572276, at *5 (plaintiffs met their burden for no

8   other reason than "the Plaintiffs' claims arise out of the acts that were directed at the forum").

9   *Planned Parenthood v. Am. Coalition of Life Activists*, 945 F. Supp. 1355, 1368 (D. Or. 1996)

10  ("The 'but for' test should not be narrowly applied; rather, the requirement is merely designed to

11  confirm that there is some nexus between the cause of action and defendant's contact with the

12  forum.") (citing *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir.1990), *rev'd on other*

13  *grounds*, 499 U.S. 585 (1991)).

14        The case of *In re Wireless Facilities* provides a contrast.  562 F. Supp. 2d 1098,

15  1104-05 (S.D. Cal. 2008).  In that shareholder derivative suit, the court considered the out-of-state

16  defendants' motion to dismiss for lack of personal jurisdiction.  *Id.*  At the "core" of the lawsuit

17  were "finance and accounting irregularities," and allegations of stock option backdating and

18  springloading.[8]  *Id.* at 1104.  The defendants were an electrical engineer and an outsourcing

19  consultant.  *Id.*  Their contacts with the forum consisted of physical business visits and

20  participation in conference calls.  *Id.*  Despite their receipt of stock options and holding of

21  executive management positions, the court granted their motion to dismiss.  *Id.*  It disagreed they

22  "must have known" about the stock option scheme and found "nothing in the record to support a

23  finding that, but for [their] contacts with California, the claims against them would not have

24  arisen."  *Id.* at 1105.

25  _____

26        [8] "Springloading takes place when a stock option is granted at a time when the grantor(s)
    know that the shares are actually worth more than the market value because the grantor(s) possess

27  material non-public information that would impact the company's share price."  *In re Ditech*
    *Networks, Inc. Derivative Litig.*, No. C 06-5157 JF, 2008 WL 820705, at *3 (N.D. Cal. Mar. 26,

28  2008).

1   Here the plaintiffs allege the defendants directed JPMorgan to purchase subprime

2   loans, including from sellers in California, securitize the loans, and resell them to investors,

3   including institutional investors in California. Compl. ¶¶ 16-18.  Were this court to apply the

4   "but-for" test strictly, these allegations would not be sufficient.  Because the plaintiffs paint a

5   picture of a nationwide failure of oversight and mismanagement, *see, e.g.*, Compl. ¶¶ 47, 96, 133,

6   146, 171, and each plaintiff is a JPMorgan shareholder, each could have brought this same suit on

7   behalf of JPMorgan even if the directors had avoided all contacts and any business in California.

8   On the other hand, if the court were to apply the test as it has been applied by the

9   majority of the courts in the Ninth Circuit, it would only need to find a "direct nexus," *In re W.*

10   *States Wholesale*, 715 F.3d at 742, or even "some nexus between the cause of action and

11   defendant's contact with the forum." *Planned Parenthood*, 945 F. Supp. at 1368.  The court

12   agrees with the majority within the Ninth Circuit and adopts this more lenient reading.  The

13   plaintiffs come close to the required showing: they allege a "substantial portion" of JPMorgan's

14   RMBS business, the business with respect to which they claim the directors breached fiduciary

15   duties and made misstatements, was conducted in California. Compl. ¶ 16.

16   The crux of a specific personal jurisdiction inquiry, however, is the extent of the

17   out-of-state defendants' contacts with the forum. *See Int'l Shoe*, 326 U.S. at 316.  Without these

18   contacts, the required causal connection cannot exist.  Without more specific factual allegations

19   of the directors' contacts with California, it is not possible to evaluate whether the alleged harm

20   arises from them.  And because the plaintiffs have not made the required showing under the first

21   part of the *Schwarzenegger* test, they cannot meet the second.

22   ### 3.   Reasonableness

23   The third part of the *Schwarzenegger* test requires a broad inquiry into the overall

24   reasonableness and fairness of personal jurisdiction. *See Ballard*, 65 F.3d at 1500-02. The court

25   considers, among other things, "(1) the extent of a defendant's purposeful interjection; (2) the

26   burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty

27   of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most

28   efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's

19

1   interest in convenient and effective relief; and (7) the existence of an alternative forum."

2   *Panavision Int'l LP v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir.1998) (citing *Burger King*, 471

3   U.S. at 476–77)). The defendant's burden is to present a "compelling case" of the

4   unreasonableness of personal jurisdiction over it. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th

5   Cir. 2008).

6          The first factor, purposeful availment, weighs in favor of the directors.  The

7   plaintiffs have alleged at most that the JPMorgan board abdicated its supervisory responsibility

8   and failed to prevent JPMorgan from incurring liability from its RMBS business, a substantial

9   portion of which was conducted in California. The directors' purposeful interjection, if any, of

10  JPMorgan's activities into California favors California no more than other states in which it

11  conducted a substantial portion of its business.  The fifth factor also weighs somewhat in favor of

12  the directors.  In comparison to the Southern District of New York, the Eastern District of

13  California reports a higher number of pending cases per judge, a slightly longer median time for

14  civil cases from filing to disposition, and a longer median time from filing to trial. Mot. 36.  As

15  defendants conceded at hearing, however, the Eastern District is among the most productive

16  district courts when its case terminations are compared to its new case filings.  *See* Federal Court

17  Management Statistics (Admin. Office of the U.S. Courts, Jun. 2014). This case may require

18  discovery from a large number of JPMorgan employees and management in New York, *see, e.g.*,

19  Mot. 39 (citing Decl. of A. Horan ¶ 4, ECF No. 49), although the plaintiffs doubtless would travel

20  to New York to obtain discovery. The seventh factor also weighs in favor of the defendants; the

21  personal jurisdiction and venue concerns this court must consider would likely not arise in the

22  Southern District of New York.

23         The other factors either weigh in the plaintiffs' favor or favor neither party.

24  JPMorgan, a large international corporation, faces little burden in defending its case in California.

25  It is unclear how the sovereignty of any other state would be negatively affected by this court's

26  exercise of personal jurisdiction. As alleged, California does have an interest in adjudicating this

27  dispute as the location of a substantial portion of JPMorgan's RMBS business. And finally, two

28  plaintiffs are California citizens, Compl. ¶¶ 20, 22, a "substantial portion" of JPMorgan's RMBS

1   business was conducted in California, *id.* ¶ 16, and the U.S. Attorney's Office in this District is

2   conducting a criminal investigation into JPMorgan's RMBS business, *id.* ¶ 4; otherwise it is

3   unclear how this district is more convenient to the plaintiffs or important for their effective relief

4   than another.

5            Because it is the defendants' burden to establish a compelling case of

6   unreasonableness, and because they have at most established that three of the seven factors weigh

7   in their favor, they have not met their burden to show this court's exercise of personal jurisdiction

8   would be unreasonable, if the complaint can be amended to satisfy jurisdiction in the first place.

9                    4.    Conclusion

10           The plaintiffs' allegations are not in the same class as those alleged in other

11   derivative suits brought outside the corporation's state of incorporation or principal place of

12   business that survived motions to dismiss under Rule 12(b)(2).  As currently alleged, the court

13   cannot hold their case survives even a liberal reading of the second part of the *Schwarzenegger*

14   test.  The plaintiffs have not made out a prima facie case of personal jurisdiction.

15           B.    Pendent Personal Jurisdiction

16           If the court does not have personal jurisdiction over the defendants based on their

17   contacts with California, it may nonetheless exercise personal jurisdiction by virtue of its power

18   to decide pendent claims. The Ninth Circuit has adopted the doctrine of "pendent personal

19   jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir.

20   2004).  Under that doctrine, if a district court has personal jurisdiction over federal claims, "then

21   it may, in its discretion, exercise pendent personal jurisdiction over the state-law claims contained

22   in the same complaint."  *Id.*

23           Here, the plaintiffs assert claims under § 14(a) of the Exchange Act.  Compl.

24   ¶¶ 304-09.  Section 27 of the Exchange Act "grants jurisdiction to the federal courts and provides

25   for venue and service of process" for claims brought under the same Act.  *Touche Ross & Co. v.*

26   *Redington*, 442 U.S. 560, 577 (1979); 15 U.S.C. § 78aa.[9]

27   _____

28           [9] Section 78aa provides: "Any suit or action to enforce any liability or duty created by this
     chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and

1    Section 27 confers nationwide service of process: "so long as a defendant has

2   minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

3   the defendant in any federal district court." *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309,

4   1316 (9th Cir. 1985).  In such a case, due process requires only "sufficient contacts with the

5   United States, not any particular state." *Id.* at 1315. Because JPMorgan is a Delaware corporation

6   with its principal place of business in New York, Compl. ¶ 23, and the individual defendants are

7   citizens of the United States, *id.* ¶¶ 25-37, if the plaintiffs assert a valid § 14(a) claim, this court

8   has personal jurisdiction to hear it.

9    For exercise of pendent personal jurisdiction to be proper, it must "arise[] out of

10   the same nucleus of operative facts" as the federal claim over which the court has personal

11   jurisdiction. *Action Embroidery*, 368 F.3d at 1180.  "Pendent personal jurisdiction is typically

12   found where one or more federal claims for which there is nationwide personal jurisdiction are

13   combined in the same suit with one or more state or federal claims for which there is not

14   nationwide personal jurisdiction." *Id.* at 1180-81.  The decision to exercise pendent personal

15   jurisdiction is within the discretion of the district court and depends on "considerations of judicial

16   economy, convenience and fairness to litigants." *Id.* at 1181 (quoting *Oetiker v. Jurid Werke,*

17   *G.m.b.H.*, 556 F.2d 1, 5 (D.C. Cir. 1977)).  Claims are sufficiently related for purposes of pendent

18   personal jurisdiction when a plaintiff "would ordinarily be expected to try them all in one judicial

19   proceeding." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1359 (9th Cir. 1988)

20   (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

21    The plaintiffs' state law claims charge the directors with causing JPMorgan to

22   enter the risky RMBS business, creating a culture that encouraged violations of the securities

23   laws, failing to oversee JPMorgan's officers and employees in the RMBS business, and failing to

24   institute internal controls that would have prevented JPMorgan from incurring liability under the

25   settlement agreements announced in late 2013.  *See* Compl. ¶¶ 284-303.  The plaintiffs' § 14(a)

26

27   regulations, may be brought in any such district or in the district wherein the defendant is found
    or is an inhabitant or transacts business, and process in such cases may be served in any other
28   district of which the defendant is an inhabitant or wherever the defendant may be found."

1    claims arise from alleged misstatements and omissions in JPMorgan's 2011 and 2012 Proxy

2    Statements. Compl. ¶ 305.  They claim these statements "falsely stated that the Company's Board

3    of Directors maintained adequate and effective risk oversight over management and failed to

4    disclose to the Company's shareholders material deficiencies in the Board's oversight of

5    management and internal controls." *Id.* ¶¶ 306, 307.  These deficiencies allegedly remained

6    throughout 2011 and 2012. *See, e.g.*, *id.* ¶¶ 197, 206.  In other words, the Proxy Statements were

7    misleading because they did not disclose the wrongs alleged in support of the plaintiffs' state law

8    claims.

9            Plaintiffs' claims all arise from the same nucleus of operative facts: the directors'

10   alleged misconduct related to JPMorgan's RMBS business and their attempt to derive personal

11   benefit from that misconduct at JPMorgan's expense.  That the claims depend on disparate

12   theories of liability does not preclude application of the doctrine of pendent personal jurisdiction.

13   *See, e.g.*, *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1070-73, 1080 (9th Cir. 2011)

14   (finding the doctrine of pendent personal jurisdiction applicable when the plaintiff, a California

15   corporation, alleged the defendant, a Pennsylvania corporation, had misappropriated proprietary

16   college course catalogs from the plaintiff's website, and the plaintiff also asserted claims under

17   the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), a similar California law, contract law,

18   unfair competition, and unjust enrichment); *ID Mktg., Inc. v. Boaz*, No. 2:05-CV-2357-GEB-

19   KJM, 2006 WL 1628018, at *3-4 (E.D. Cal. June 7, 2006) (applying pendent personal jurisdiction

20   to the plaintiff's claims of "RICO violations, trademark infringement, false designation of origin,

21   breach of contract, negligent interference with prospective economic advantage, unfair

22   competition, and breach of the duty of loyalty" that were "all based on Defendants' alleged

23   scheme and agreement to deceive one of Plaintiff's potential customers into believing it was

24   conducting business with Plaintiff when in fact it was not").

25           The defendants have also moved to dismiss the plaintiffs' § 14(a) claim.  If this

26   federal claim fails, it could no longer provide a basis for pendent jurisdiction.  The court thus

27   turns to the question of whether the plaintiffs' claims under § 14(a) survive dismissal.

28

1    C.    Section 14(a)

2        The directors move to dismiss the plaintiffs' § 14(a) claim for failure to state a

3    claim upon which relief can be granted.  Mot. 8-14.  In their Reply, the defendants contend for the

4    first time that the new case of *Steinberg v. Dimon*, No. 14 Civ. 688(PAC), 2014 WL 3512848

5    (S.D.N.Y. July 16, 2014), bars the plaintiffs from asserting demand futility of this claim, under

6    both the doctrines of claim preclusion and issue preclusion. Reply 12-13.  The court first

7    considers the argument the plaintiffs are precluded from asserting or litigating a claim under

8    § 14(a), and second addresses the adequacy of their pleadings.

9        1.    Preclusion

10        The defendants did not argue in their original motion that *Steinberg* precluded the

11    plaintiffs from litigating their § 14(a) claim.  A district court should "be cautious about raising a

12    preclusion bar *sua sponte*" if "no judicial resources have been spent on the resolution of a

13    question." *Arizona v. California*, 530 U.S. 392, 413, *as supplemented*, 531 U.S. 1 (2000).  The

14    Ninth Circuit effectively requires a district court to give the parties an opportunity to be heard on

15    preclusion before dismissal.  *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1055 & n.6

16    (9th Cir. 2005) ("Our research failed to find a single case in which this court has upheld a

17    dismissal for claim or issue preclusion where the parties were not given any opportunity to be

18    heard on the issue.").  Here the parties briefed and argued the issue of claim and issue preclusion

19    with respect to demand futility of the state law claims only.  Mot. 18-21; Opp'n 14-18; Reply 9-

20    12.  The court heard very limited argument on preclusion of the plaintiffs' § 14(a) claims.  The

21    court therefore declines to address the preclusive effect of *Steinberg* on the § 14(a) claims,

22    without prejudice.

23        2.    Rule 12(b)(6) Pleading Adequacy

24        a.    Legal Standard

25        Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

26    dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court may

27    dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged

28    under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

1990).  In order to survive a motion to dismiss the complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint and the dispositive issues of law in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In making this context-specific evaluation, this court must construe the complaint in the light most favorable to the plaintiffs and accept as true the factual allegations of the complaint.  *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  This rule does not apply to "'a legal conclusion couched as a factual allegation,'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), nor to "allegations that contradict matters properly subject to judicial notice" or to material attached to or incorporated by reference into the complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001).  A court's consideration of documents attached to a complaint or incorporated by reference or matter of judicial notice will not convert a motion to dismiss into a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003); *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *compare Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (noting that even though a court may look beyond pleadings on motion to dismiss, generally a court is limited to face of the complaint on 12(b)(6) motion).

b.      Section 14(a)

Section 14(a) prohibits the solicitation of proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a).  Rule 14a-9(a), adopted subject to the authority granted in § 14(a), prohibits solicitation of proxy statements

1
2
3
4
5

containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

6

17 C.F.R. § 240.14a-9(a).

7        "To state a claim under § 14(a) and Rule 14a–9, a plaintiff must establish that

8   '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the

9   plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the

10  solicitation materials, was an essential link in the accomplishment of the transaction.'" *New York*

11  *City Employees' Ret. Sys. v. Jobs (NYCERS)*, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting

12  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir.2007)), *overruled in part on*

13  *other grounds*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 925 (9th Cir. 2012).  After enactment of

14  the Private Securities Litigation Reform Act (PSLRA), Pub. L. 104-67, 109 Stat. 737 (codified as

15  amended in scattered sections of title 15 of the U.S. Code), "a Section 14(a), Rule 14a–9 plaintiff

16  must also demonstrate that the misstatement or omission was made with the requisite level of

17  culpability." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000); *see also NYCERS*,

18  593 F.3d at 1022 ("[P]rivate plaintiffs must meet the heightened pleading standards of the

19  PSLRA.").  In addition, if a complaint sounds in fraud, "Federal Rule of Civil Procedure 9(b) and

20  the PSLRA require [a plaintiff] to plead her case with a high degree of meticulousness."

21  *Desaigoudar*, 223 F.3d at 1022.  Specifically, the PSLRA requires a securities fraud plaintiff to

22  identify: "(1) each statement alleged to have been misleading; (2) the reason or reasons why the

23  statement is misleading; and (3) all facts on which that belief is formed." *Id.* at 1023.

24        The plaintiffs' complaint here sounds in fraud.  The plaintiffs allege the directors

25  caused JPMorgan to "commit multiple fraudulent and deceptive acts," Compl. ¶ 8, and that

26  "JPMorgan's failure in connection with its due diligence and quality control processes constituted

27  or operated as a systemic fraud on thousands of investors," *id.* ¶ 13.  They allege the directors

28  caused JPMorgan to "make an aggressive move into the origination and securitization of

26

1  subprime mortgages and the marketing and sale of subprime RMBS through fraudulent means."

2  *Id.* ¶ 118.  They allege the directors concealed information from shareholders out of self-interest,

3  *id.* ¶ 222, Opp'n 9, and that they also made misstatements in the proxies "in order to benefit

4  themselves financially to the detriment of the Company," Compl. ¶ 206.  *See also Countrywide*,

5  554 F. Supp. 2d at 1076 & n.36 (finding "the complaint clearly sounds in fraud" because

6  "Plaintiffs allege that the proxy statements failed to disclose that senior officers were being

7  'rewarded for running Countrywide into the ground'" (alterations omitted)).

8                                        c.        Materiality

9               A misstatement or omission is material "if there is a substantial likelihood that a

10  reasonable shareholder would consider it important in deciding how to vote."  *TSC Indus., Inc. v.*

11  *Northway, Inc.*, 426 U.S. 438, 449 (1976).  A plaintiff need not allege a misstatement or omission

12  would have caused a reasonable investor to change her vote.  *See id.*  Rather, "there must be a

13  substantial likelihood that the disclosure of the omitted fact would have been viewed by the

14  reasonable investor as having significantly altered the 'total mix' of information made available."

15  *Id.*

16               In some cases a director's misconduct is immaterial as a matter of law.  First,

17  "director misconduct of the type traditionally regulated by state corporate law need not be

18  disclosed in proxy solicitations for director elections.  This type of mismanagement, unadorned

19  by self-dealing, is simply not material or otherwise within the ambit of federal securities laws."

20  *Gaines v. Houghton*, 645 F.2d 761, 779 (9th Cir. 1981), *overruled in part on other grounds*,

21  *Matter of McLinn*, 739 F.2d 1395, 1397, 1405 (9th Cir. 1984).  Second, as described above, the

22  PSLRA requires "meticulousness" in pleading.  *Desaigoudar*, 223 F.3d at 1022-23.  And third,

23  generalized aspirational statements are not material.  *See Cook, Perkiss & Liehe, Inc. v. N. Cal.*

24  *Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (discussing "puffery," including in the

25  context of federal securities cases).

26

27

28

Here the plaintiffs allege JPMorgan's 2011 and 2012 proxy statements included the following misleading statements:[10]

- Implementing the [shareholder proposal to require an independent lead director] is unnecessary because the Firm already has a Presiding Director meeting NYSE independence standards and serving the purposes described by the proponent. ¶ 196.

- [JPMorgan's] current structure provides the independent leadership and management oversight sought by the proposal. *Id.*

- The Board of Directors is responsible for the oversight of management on behalf of the Firm's shareholders. The Board accomplishes this function acting directly and through its committees. ¶ 201.

- The Board has determined that the most effective leadership model for the Firm currently is that Mr. Dimon serves as both Chairman and Chief Executive Officer. *Id.*

- The Board believes it is functioning effectively under its current structure, and that the current structure provides appropriate oversight protections. The Board does not believe that introducing a separate Chairman at this time and with this CEO would provide appreciably better direction for and performance of the Firm, and instead could cause uncertainty, confusion and inefficiency in board and management function and relations. *Id.*

- Independent directors comprise more than 90% of the Board and 100% of the Audit Committee, Compensation & Management Development Committee . . . , Governance Committee, Public Responsibility Committee and Risk Policy Committee. *Id.*

- The Firm's risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks taken in its business activities. ¶ 202.

- The Firm employs a formalized risk appetite framework to clearly link risk appetite and return targets, controls and capital management. The CEO is responsible for setting the overall risk appetite for the Firm . . . . The Risk Policy Committee approves the risk appetite policy on behalf of the entire Board of Directors. *Id.*

- Risk Management operates independently to provide oversight of firmwide risk management and controls, and is headed by the Firm's Chief Risk Officer, who is a member of the Firm's Operating Committee and reports to the CEO and is accountable to the Board of Directors, primarily through the Board's Risk Policy Committee. *Id.*

- The Board of Directors exercises its oversight of risk management principally through the Board's Risk Policy Committee and Audit Committee. . . . Each of the committees oversees reputation risk issues within its scope of

---

[10] Here again, all paragraph citations are to paragraphs in the Complaint.

responsibility. . . . The Board of Directors also reviews selected risk topics directly as circumstances warrant.  *Id.*

- Implementing the [shareholder proposal separating the roles of Chairman and CEO] is unnecessary because the Firm's board leadership structure already provides the independent leadership and oversight of management sought by the proponent.  ¶ 204.

- The Firm's Board of Directors has no established policy on whether or not to have a non-executive chairman and believes that it should make that judgment based on circumstances and experience.  The Board has determined that the most effective leadership model for the Firm currently is that Mr. Dimon serves as both Chairman and Chief Executive Officer. The Board believes it is functioning effectively under its current structure, and that the current structure provides appropriate oversight.  ¶ 205.

- These statements were false and misleading because, as alleged in more detail herein, the Director Defendants knew that the Board was not exercising effective oversight of management, that Dimon and other high-level management had intentionally disregarded and overridden the Company's underwriting standards and internal controls, and that management was doing so in order to benefit themselves financially to the detriment of the Company.  ¶ 206.

*See also generally* Compl. ¶¶ 191-212.

The plaintiffs explain these statements were "false and misleading because they stated and implied that the Board, with Dimon as both Chairman and CEO, was exercising effective oversight of management, when in fact the directors knew that was not the case." Compl. ¶ 197.  The plaintiffs also say these statements were misleading because "management had in fact intentionally overridden and violated the Company's own risk management rules, the Company's underwriting standards, and other key internal controls," *id.* ¶ 197, and because "management was doing [all this] in order to benefit themselves financially to the detriment of the Company," *id.* ¶ 206.  They allege the directors were not independent as was reported in the proxies.  *See, e.g.*, *id.* ¶¶ 234-36.

The first question is whether *Gaines v. Houghton, supra,* would disqualify the alleged misstatements as a matter of law.  In connection with their § 14(a) claim, the plaintiffs also allege violations of the directors' fiduciary duties under state law.  State law violations fall outside the ambit of the federal securities laws and "need not be disclosed in proxy solicitations for director elections."  *Gaines*, 645 F.2d at 779.  The alleged misrepresentations in the 2011 and 2012 proxies must stand on their own feet as § 14(a) violations.

1         *In re Countrywide*, decided in the Central District, was a similar case.  554 F.

2    Supp. 2d 1044.  In that case the plaintiffs, Countrywide's shareholders, alleged in a derivative suit

3    that the company had not adhered to its underwriting standards and had begun building a portfolio

4    of risky loans.  *Id.* at 1050-51.  They also alleged Countrywide had not disclosed these failures in

5    its 2005, 2006, and 2007 proxy statements, which sought among other things the shareholders'

6    vote in favor of reelection of the defendant directors and approval of their compensation.  *Id.* at

7    1054.  As here, the plaintiffs in *Countrywide* claimed the defendants would not have been

8    reelected had the proxies disclosed the company's failure to adhere to its underwriting standards.

9    *Id.*  The court held that the alleged proxy violations were "not limited to a failure to disclose a

10   breach of fiduciary duty.  Rather, [plaintiffs] allege that the proxy statements failed to disclose

11   that Countrywide abandoned its underwriting standards, thus exposing itself to an undisclosed

12   level of heightened risk."  *Id.* at 1076-77.  "The allegations that the directors breached their duties

13   in failing to monitor" were "of secondary importance" to the plaintiff's § 14(a) claim.  *Id.* at

14   1077.  This meant the plaintiffs' allegations of § 14(a) violations were independent of their state-

15   law allegations and survived the application of *Gaines*. *Id.*

16        *Countrywide* draws a fine line between two species of disclosure: (a) that the

17   corporation had abandoned its underwriting standards, and (b) that the directors failed to monitor

18   the corporation, allowing it to abandon its underwriting standards.  Here the plaintiffs have

19   alleged more than was alleged in *Countrywide*.  They claim the directors, in the pursuit of

20   personal gain, either turned a blind eye to or expressly authorized the inadequate controls in

21   JPMorgan's RMBS business, hiding deficiencies from investors in order to feather their own nest.

22   Compl. ¶ 284.  Plaintiffs allege similarly under § 14(a) that the directors misstated their

23   independence and knowledge of deficiencies in JPMorgan's internal controls out of the same self-

24   interest, and assert the failures to disclose were all part of a continuous scheme alleged in their

25   complaint.  *Id.* ¶¶ 306-08.  In *Countrywide,* the claim was mere failure to disclose the

26   corporation's status; here the claim is a failure to disclose both JPMorgan's status and the

27   directors' role in bringing about and concealing that status.  In other words, the plaintiffs have not

28   advanced a theory of liability in which the directors' state-law violations were "of secondary

importance" to their § 14(a) violations such that the § 14(a) claims are independently material under *Gaines*. *Countrywide*, 554 F. Supp. 2d at 1077.

That said, even "director misconduct of the type traditionally regulated by state corporate law" is material and must be disclosed when the plaintiffs also make "credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors." *Gaines*, 645 F.2d at 779.

Here the plaintiffs submit the misstatements are in the nature of self-dealing and contend the directors deceived shareholders in order to obtain personal benefit. *E.g.*, Compl. ¶ 222; Opp'n 9. But the allegations, as currently pleaded, support only a tenuous reading of self-interest. They allege the directors "had the largest financial incentive for engaging in the misconduct" alleged in the complaint because "JPMorgan's involvement in the subprime business was a key driver of JPMorgan's profitability, which significantly bolstered the compensation to JPMorgan executives and directors." Compl. ¶ 222. The fact that directors received compensation does not establish they engaged in self-dealing—otherwise every compensated director's undisclosed violation of state law related to any involvement in a "key driver" of the corporation's business would give rise to a § 14(a) claim.

The plaintiffs argue three directors were "responsible for both setting compensation policies and ensuring JPMorgan had proper corporate governance structures in place" to suggest these directors engaged in self-dealing. Opp'n 9 (citing Compl. ¶¶ 268-78). Their theory appears to be that because these directors approved both the board's pay and set the governance rules the board was required to follow, they could immunize themselves from liability and yet receive compensation. To endorse this theory of self-dealing would bootstrap a § 14(a) cause of action from every claimed failure to create "proper corporate governance structures" if the director also voted on compensation packages. For the same reason, a director cannot be said to engage in self-dealing for the reason she did not disclose a previous violation of state corporation law; otherwise § 14(a) would require the board disclose every state-law violation, a result in direct conflict with the doctrine espoused in *Gaines*. 645 F. 2d at 778-79 ("While we

31

1   neither condone nor condemn these and similar types of corporate conduct . . . , we believe that

2   aggrieved shareholders have sufficient recourse to state law claims against the directors . . . .").

3          The second question is whether the plaintiffs have particularly alleged the

4   directors' statements were false or misleading as the PSLRA requires.  They have not.  For

5   example, regarding the statement that "[t]he Board of Directors is responsible for the oversight of

6   management on behalf of the Firm's shareholders," Compl. ¶ 201, the plaintiffs do not allege that

7   some other body or no one at all was responsible for oversight of management.  In fact, they

8   appear to allege the opposite is true: "the business and affairs of JPMorgan are managed by and

9   under the direction of JPMorgan's Board of Directors," *id.* ¶ 213.  Similarly, to the statement that

10  "[t]he Board accomplishes this function acting directly and through its committees," *id.* ¶ 201, the

11  plaintiffs do not allege the Board actually accomplished the function some other way.  The same

12  is also true of statements such as "[t]he Board does not believe that introducing a separate

13  Chairman at this time and with this CEO would provide appreciably better direction for and

14  performance of the Firm." *Id.*  The plaintiffs do not allege that the Board actually believed a

15  different CEO would be better for the company.  *See Virginia Bankshares, Inc. v. Sandberg*, 501

16  U.S. 1083, 1092-93 (1991) (holding that "directors' statements of reasons or belief" are factual

17  and may be proven false or misleading by reference to "corporate minutes and other statements of

18  the directors themselves" or "circumstantial evidence bearing on the facts that would reasonably

19  underlie the reasons claimed and the honesty of any statement that those reasons are the basis for

20  a recommendation or other action").  The PSRLA requires a more meticulous analysis than the

21  plaintiffs have performed here in crafting their allegations: they must point to a statement, explain

22  why it was false or misleading, and list the facts that show it was false or misleading.

23  *Desaigoudar*, 223 F.3d at 1023.

24          Third, generalized or vague statements cannot be material.  The Second Circuit

25  recently evaluated the materiality of alleged misstatements similar to some of those raised here.

26  In *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co. (IBEW)*, the

27  plaintiffs alleged JPMorgan's directors had "made numerous misrepresentations regarding its

28  'highly disciplined' risk management and its standard-setting reputation for integrity"; that

1    JPMorgan "had 'risk management processes [that] are highly disciplined and designed to preserve

2    the integrity of the risk management process'; that it 'set the standard' for 'integrity'; and that it

3    would 'continue to reposition and strengthen [its] franchises with a focus on financial

4    discipline.'"  553 F.3d 187, 205-06 (2d Cir. 2009) (alterations in original, citations omitted).  As

5    in this case, the plaintiffs in *IBEW* alleged these statements were misleading because JPMorgan

6    later faced litigation and liability for failures in financial discipline.  *Id.* at 206.  The Second

7    Circuit described these alleged misstatements as "no more than 'puffery' which does not give rise

8    to securities violations" because "they are too general to cause a reasonable investor to rely upon

9    them." *IBEW*, 553 F.3d at 206.

10          In some ways this case is distinguishable from *IBEW*.  The plaintiffs' allegations

11    here are both retrospective and more basic.  The complaint alleges the board purposefully

12    overrode risk management policies and underwriting standards but reported in the 2011 and 2012

13    proxy materials that they abided by these policies and standards.  Compl. ¶ 206.  It alleges the

14    board lacked independence, but that the proxy materials reported their independence.  *Id.*  Yet

15    some of the allegations resemble those in *IBEW* and are not material.  The Complaint alleges the

16    board knew it was not exercising "effective risk management," but state in their proxy materials

17    that the current board structure was the "most effective" and provided "appropriate oversight

18    protections."  *Id.* ¶ 201.  Because "effective" and "appropriate" are vague and may describe a

19    wide variety of results in the context of a "leadership structure" and "oversight," they are not

20    material.  *IBEW*, 553 F.3d at 206; *see also C.D.T.S. v. UBS AG*, No. 12 Civ. 4924(KBF), 2013

21    WL 6576031, *1, 4-5 (S.D.N.Y. Dec. 13, 2013) (statements describing the defendant's

22    investment bank's "effective controls" and "effective risk management" were not actionable,

23    especially when released in 2009 and 2010, a time when "the banking sector had experienced

24    enormous losses") (citing *IBEW*, 553 F.3d at 206).

25          In summary, the plaintiffs have not alleged the 2011 and 2012 proxy statements

26    contained material misstatements in violation of § 14(a) with the specificity required by Ninth

27    Circuit law and the PSRLA.

28

1            d.      *Causation*

2         To adequately allege injury, plaintiffs in a § 14(a) case must allege loss causation.

3 *NYCERS*, 593 F.3d at 1023 (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S.

4 148, 165 (2008); *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir.2000)).  The plaintiffs must allege

5 the defendant "caused the loss for which the plaintiff seeks to recover damages." *NYCERS*,

6 593 F.3d at 1023 (quoting 15 U.S.C. § 78u–4(b)(4)). This requires a showing of both an

7 economic loss and proximate causation. *Id.* (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

8 346 (2005)).  In other words, the complaint must "connect[] the proxy misstatements with an

9 actual economic harm." *Id.*

10         In some cases causation is presumed.  *See Mills v. Elec. Auto-Lite Co.*, 396 U.S.

11 375, 384 (1970) ("Where there has been a finding of materiality, a shareholder has made a

12 sufficient showing of casual relationship between the violation and the injury for which he seeks

13 to redress if . . . he proves that the proxy solicitation itself, rather than the particular defect in the

14 solicitation materials, was an essential link in the accomplishment of the transaction.").  The

15 Ninth Circuit expanded on *Mills* in *Gaines v. Houghton*: "[W]hen the plaintiff-shareholder attacks

16 only the election itself, instead of seeking money damages or other relief for the underlying

17 misconduct, the proper analysis shifts from causation to materiality."  645 F.2d at 776.  "[T]he

18 equation of causation and materiality . . . is logically limited to situations in which shareholder

19 approval was sought (and fraudulently procured) for a transaction requiring such approval,

20 typically so-called 'fundamental corporate changes.'"  *Id.* at 775.  Here, because the plaintiffs

21 allege JPMorgan has been damaged by the conduct underlying the alleged misstatements, and

22 because this case does not involve a transaction of the type contemplated in *Mills* or *Gaines*,

23 causation is not presumed.

24         The plaintiffs allege, and the court therefore assumes, that "JPMorgan was

25 subjected to billions of dollars in damages due to the Board's materially deficient oversight of

26 management and the Board's failure to ensure adequate internal controls at JPMorgan," in the

27 form of settlement liability and reputational harm.  *See* Compl. ¶¶ 293, 308.  With the assertion of

28 monetary damages the plaintiffs have alleged economic harm.  As to proximate cause, the

1    plaintiffs allege the harm "could have been avoided or mitigated" if the shareholders had

2    appointed an independent director as chairman or had appointed independent directors to the

3    board in 2011 or 2012.  *Id.* ¶ 308.  In other words, had the 2011 and 2012 proxies not included

4    alleged material deficiencies, the shareholders would have elected different directors and elected

5    an independent director as lead director in 2011 or 2012.  If JPMorgan had benefited from this

6    independent oversight, JPMorgan would not have had to pay some or all of the approximately

7    $17.5 billion in civil settlements with the Department of Justice and private investors, and would

8    not have suffered other related reputational and similar harms.

9           The Complaint includes no more specific allegations.  It is implausible that by

10   electing different directors JPMorgan could have avoided the entirety of the harm it suffered as a

11   result of its RMBS business.  Significant damage had been done before 2011.  *See* Compl. Ex. A

12   at 128 ("The Justice Department . . . announced a $13 billion settlement with JPMorgan . . . to

13   resolve federal and state civil claims arising out of the packaging, marketing, sale, and issuance of

14   residential mortgage-backed securities . . . prior to Jan. 1, 2009.").  In 2011 or 2012, newly

15   elected independent directors could not have undone the sale of the securities JPMorgan created

16   and marketed in the past.  A post-2011 board could not have exercised more effective oversight of

17   JPMorgan during the 2005-2008 timeframe.  Perhaps JPMorgan could have avoided a portion of

18   liability with immediate reforms by a new board, a new business structure, and a contrite and

19   proactive appeal to authorities on bended knee, but this possibility is speculative.  The Complaint

20   does not suggest an avenue of mitigation, which alternative slate of directors could have been

21   elected, what steps this alternative board could have taken, what changes the alternative board

22   would have made, how each of these steps might have reduced liability, or by what amount

23   liability might have been reduced.  No one of these steps is strictly necessary, but without more

24   than is currently alleged, the complaint does not adequately plead proximate cause.

25                          e.      *PSLRA Culpability*

26          To state a claim under § 14(a), a plaintiff must also "demonstrate that the

27   misstatement or omission was made with the requisite level of culpability."  *Desaigoudar*,

28   223 F.3d at 1022.  The PSLRA requires the factual allegations "giv[e] rise to a strong inference"

1   of that level of culpability.  15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has not specified

2   what level of culpability is required to establish a § 14(a) claim, *see TSC*, 426 U.S. at 444 n.7, but

3   most courts require a showing of negligence at least.  *See, e.g.*, *Kelley v. Rambus, Inc.*,

4   No. C 07-1238 JF (HRL), 2008 WL 5170598, at *3 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 F. App'x

5   570 (9th Cir. 2010); *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1248,

6   1263 (N.D. Cal. 2000) (finding the "weight of authority" rejects scienter in favor of negligence).

7          Here, the complaint does not create a "strong inference" of negligence.  Although

8   it tells a detailed story of wrongdoing and perverse incentives within JPMorgan, *see* Compl.

9   ¶¶ 115-85, it does not describe with sufficient detail what the directors knew or did not know or

10  how they were negligent in failing to discover what they should have.  The plaintiffs allege only

11  that the board should have or must have received some information or report on the RMBS

12  business, and that they must have known about it and discussed it.  *See, e.g.*, *id.* ¶ 228; Decl. of

13  William Sarsfield ¶ 17, ECF No. 53.  Although the complaint alleges the directors caused

14  JPMorgan to issue a misleading 10-K in 2006, it points to no presentation or report to the board

15  that would have caused the board to issue it negligently. *Id.* ¶ 122.  The complaint implies

16  discovery will reveal the truth and relies on the reader to infer the board's knowledge.  The

17  plaintiffs are indeed entitled to all reasonable inferences in their favor, but not to favorable

18  speculation. *See Desaigoudar*, 223 F.3d at 1025 ("[S]uspicious circumstances alone cannot

19  satisfy Rule 9(b) or the PSLRA.").  They have not stated a claim under § 14(a).

20         Because the plaintiffs have not stated a claim under § 14(a), the court may not

21  exercise pendent jurisdiction over their state-law claims.  This leaves the court no basis for

22  personal jurisdiction over the defendants.

23         D.      Leave to Amend

24         Federal Rule of Civil Procedure 15(a)(2) provides "[t]he court should freely give

25  leave [to amend its pleading] when justice so requires," and the Ninth Circuit has "stressed Rule

26  15's policy of favoring amendments." *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149,

27  1160 (9th Cir. 1989).  "In exercising its discretion [regarding granting or denying leave to amend]

28  'a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits

36

1   rather than on the pleadings or technicalities.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183,

2   186 (9th Cir. 1987) (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)).

3   However, "the liberality in granting leave to amend is subject to several limitations. Leave need

4   not be granted where the amendment of the complaint would cause the opposing party undue

5   prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay." *Ascon*

6   *Properties*, 866 F.2d at 1160 (internal citations omitted).  In addition, a court should look to

7   whether the plaintiff has previously amended the complaint, as "the district court's discretion is

8   especially broad 'where the court has already given a plaintiff one or more opportunities to amend

9   [its] complaint.'"  *Id.* at 1161 (quoting *Leighton*, 833 F.2d at 186 n.3).

10          Here, granting leave to amend is appropriate.  The state of the law of personal

11   jurisdiction appears to allow derivative cases brought outside the state of incorporation or

12   principal place of business.  As described below, the plaintiffs may move to seek limited

13   jurisdictional discovery and include in an amended complaint more factual allegations along the

14   lines described above.  For this reason, and because the plaintiffs may include more detailed

15   allegations of § 14(a) violations, amendment would not necessarily be futile.  The court perceives

16   no reason to suspect the defendants will suffer undue prejudice or that the plaintiffs will amend in

17   bad faith.

18          E.      Potential for Limited Discovery

19          Although plaintiffs aver they do not require jurisdictional discovery to surpass the

20   initial pleading hurdle, the court has the ability to allow some discovery when "the pleadings and

21   other submitted materials raise issues of credibility or disputed questions of fact with regard to

22   jurisdiction."  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977). The

23   court should normally permit discovery when "'pertinent facts bearing on the question of

24   jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'"

25   *Butcher's Union Local No. 498, United Foods & Commercial Workers v. SDC Inv., Inc.*, 788

26   F.2d 535, 540 (9th Cir.1986) (quoting *Data Disc*, 557 F.2d at 1285 n.1 and *Laub v. U.S. Dept. of*

27   *Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003)).  The Ninth Circuit has not specified the showing a

28   plaintiff must make before a district court may grant limited jurisdictional discovery, but "district

courts in this circuit have required a plaintiff to establish a 'colorable basis' for personal jurisdiction before discovery is ordered." *Martinez v. Manheim Cent. California*, No. 1:10-CV-01511-SKO, 2011 WL 1466684, at *4 (E.D. Cal. Apr. 18, 2011) (citing *Mitan v. Feeney*, 497 F. Supp.2d 1113, 1119 (C.D. Cal. 2007) and *eMag Solutions, LLC v. Toda Kogyo Corp.*, No. C 02–1611 PJH, 2006 WL 3783548, at *2 (N.D. Cal. Dec. 21, 2006)).  A "colorable showing" is less than a prima facie showing; it "could be equated [to] requiring the plaintiff to come forward with 'some evidence' tending to establish personal jurisdiction over the defendant." *Id.* at *4 (citing *Mitan*, 497 F. Supp. 2d at 1119).  But "limited discovery should not be permitted to conduct a 'fishing expedition.'" *Martinez*, 2011 WL 1466684, at *3 (quoting *Rich v. KIS Cal., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988)).

The allegations here establish a "colorable basis" for jurisdiction.  The allegations suggest a national scheme and may allow an inference of the defendants' complicity with that scheme, but the allegations lack the definiteness and substantiality required in a derivative case brought against JPMorgan in California rather than New York and Delaware.

If plaintiffs wish to seek limited discovery prior to amending their complaint, they must file a proposed discovery plan with the court, setting their request for hearing on the court's civil law and motion calendar.

III.   CONCLUSION

For the foregoing reasons, the court:

(1)   GRANTS the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction with leave to amend;

(2)   GRANTS the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and 17 C.F.R. § 240.14a-9 with leave to amend; and

/////

/////

/////

1       (3)      ORDERS the plaintiffs to file an amended complaint within 30 days of this order.

2                Alternately, if plaintiffs seek limited jurisdictional discovery before amending the

3                complaint, they shall file their proposed discovery plan within 30 days.

4                IT IS SO ORDERED.

5    DATED:  October 23, 2014.

6

7                                                         _____

8                                                         UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28